Turn to the next matter on our calendar. First Bank Puerto Rico versus Giddens and SEPA. Interesting case. Thank you very much. Counsel. Good morning, Your Honor, Your Honor, Your Honor. May I please the Court, Robert Honeywell of K&L Gates for First Bank Puerto Rico, appellant. Your Honors, this case may be the poster child of the Lehman Brothers bankruptcy. Believe it or not, it is the last disputed customer claim in a Lehman case. I believe it. Yeah. Could you tell us all why you didn't file in the bankruptcy? Your Honor, First Bank has always believed that its primary remedy was against LBI as a collateral custodian. The original swap contract expressly said... If you had filed in bankruptcy, would that have kept you from making the claim you are now making? Your Honor... You would have gotten something out of bankruptcy, but not everything. It would have been something. Excuse me. Yeah, but you would have gotten something, and then you would still be able to claim, wouldn't you? If you were in fact a customer under FINRA, wouldn't you have been able to do that? I believe that's correct. They are alternate remedies. Then why didn't you do it? First Bank... It's a little odd that not having done that, having lost the claim, and I have doubts about collateral estoppel, but you lost the claim with respect to the securities themselves. You now make this rather contorted claim that you are a customer, and therefore something other than the securities themselves was what you lost, and therefore you have a right to them. It seems a little odd. Your Honor, First Bank has always considered its primary remedy against collateral custodian. A customer claim is based on... If that is so, how does First Bank look at all like the kind of customer person who uses a broker and whom the broker then does something improper with respect to the collateral? Here you had given money to somebody, securities to somebody, so that you could do some things, but they could too. That was in the contract, but apart from the contract, it was clear what that deal was. This wasn't you going to a broker. So what has FINRA got to do with this? This is why, Your Honor, we believe this is a case of first impression. All the precedents before on SIPA dealt with more conventional brokerage relationships. This is an unconventional broker relationship? No, I do not believe... No relationship with Lehman, Inc. itself at all? No, actually... You had a relationship. You had an interest rate trade swap arrangement with Lehman Brothers.  You had a deal with them, and you gave them some stock. And in the deal that you gave them that stock, you said you could sell it. I don't tell my broker that he or she can sell my stock without my consent. Now, some brokers get that. But I also don't agree to interest rate trade swaps. I don't know what the hell they are. But so I don't... This is a very round peg with an exceedingly square hole. It doesn't fit. Your Honor, there were three parties to this relationship. There was the interest rate swap, which was with LBSF. With whom you signed an agreement. That's correct. Who's the third party? The third party is LBI. And what arrangement did you sign with them? There was no written... None, because you had none. The relationship between LBI was with the other Lehman subsidiary, not you. They moved the certificates over to them. And ultimately, it was they that sold them to Barclays after Lehman went under. You had no relationship with them. With due respect, Your Honor, I disagree. Did you have control over them, Lehman, placing the stock with that entity? No. Did you? Was your consent required? For them to use the securities. Yeah. It wasn't? No, it was not. It wasn't? In the exact same way that... Oh, this is, I don't, it's creative, but one might say foolhardy. Your Honor, the language that enabled them to do that in the swap contract is... You're boys and girls. You're commercial entities. You have to live by the arrangements you made. This is true. This is pre-Lehman bankruptcy. And this was how it was done. Nobody expected Lehman. Nobody said, oh, by the way, Lehman's going to go bankrupt on September 7th. No one expected it. No, I mean, nobody did. I agree with that. Especially the people who were working there. Well, some of them. The issue here before the Court is who was that securities account being held for? It wasn't held for you. With due respect, Your Honor, we disagree. You had no contract with them. You had no contract whatsoever. And the people that placed it there were not your agents. They were free to do with that stock as they wished. All they had to do is on the day they defaulted and you demanded their return, they had one of two options, to return the securities to you or to pay you what their value was. They had options. They did not have to give you the stock back. They had the right to give you the money. And, therefore, if they did that, then it's impossible for you to be a customer under the SIPA with regard to the folks that eventually sold your stock. Your Honor, the CSA, the collateral agreement that was at issue here. Securities, I'm sorry. I misspoke. I didn't mean to. I'm sorry. Too many acronyms. Go ahead. The CSA is the applicable contractor. It was a security agreement. Why isn't this case very much like Carval? Because Carval involved a bilateral repo. And in a bilateral repo. Now you're telling me bilateral repo, any number of letters, any number of things of the sort that Judge Wesley said that he didn't understand. And if he doesn't understand them, I at my age surely don't. But pass that aside. Why isn't the essence of the thing that you, just as the parties in Carval, were in the kind of trading, gaming, investing type of thing, which is totally different from the sort of thing that SIPRA was there to protect? And in that sense, wherever one is repo and the other is Polri or whatever, they are very much alike. Your Honor, we believe they are extremely different. Because with apologies for using industry terms like repo, a repurchase agreement has been held through years of precedent as a transfer of title to the other repo counterparty. A swap in the security arrangement at issue here did not transfer title. But your contract said that they could do what they wanted. Exactly. Maybe they didn't transfer title, but you gave them something, which was for purposes of whether this is a SIPRA thing or not, the equivalent. The exact same contract said that even if they used it for those purposes, including sales, rehab obligations, whatever, the collateral was always deemed to remain there. But your problem with that is that you've got an affirmed judgment at this circuit that's already determined that you had no property interest in that stock. In those securities, it became part of the bankruptcy estate. That ship has sailed. That is a collateral estoppel issue. You bet your life it's collateral estoppel. Exactly. I remember that case well. Judge Pooler and I sat on it. We affirmed the district court's determination in a summary order. The entire securities industry is based on the distinction between securities. Are you going to tell us we were wrong in that? No, I'm not. No, I'm not at all. You agree that we were right. Yes, I am. Then the ship has sailed. With due respect, Your Honor, I disagree because it's just like a bank. I know what I hear when I hear with due respect. Yes, I am respectfully disagreeing. The point is that your only claim of difference is because of the securities themselves, then the Barclays case is collaterally estopped. If instead your claim is, as you try to make it out here, that you had an interest other than in the securities themselves because you were a customer and, therefore, that doesn't collaterally estop you because you're claiming something beyond the securities, then the fact that the only thing that you can say about them is that they had to keep the securities doesn't matter. Then you are under carve-out. That is, I don't see how you can have it both ways. If it is the securities because you're saying they had to keep the securities, then you lost in Barclay. If it isn't the securities and it's something else, then what is that something else as to which you were a customer when, as to everything else, they could do whatever they pleased? I can address both the collateral estoppel point and Carvel. The entire industry, it's similar to a bank account. A bank obviously uses cash in customers' accounts to make loans, to do trades, whatever. The bank always remains liable for the customer's account balances. The securities industry is predicated on the exact same approach, particularly UCC Article 8, which governs the entire industry. It is commonplace, billions, trillions of dollars for collateral custodians and broker-dealers to use securities that have been deposited for their own business model. They do trades. They use it as collateral for their own loans. Regardless of what happens, they remain liable for positions in their books and records. That is what happened here. The positions in their books and records remain the same at all times. First Bank got monthly statements saying it was there at all times. The records that LBI maintained said they were long positions. They never change, regardless of the securities flying all over the place and ending up in Barclays. If we say that securities and securities positions are the same, not only the industry but every SIPA case will be screwed up because the SIPA statute, look at the definition of net equity. It's based on securities positions. There would not be a SIPA filing if the securities were still there. It is based on the securities positions, the definition of net equity. Everything in UCC Article 8 says it does not matter what happened to the underlying asset. You have a claim against the collateral custodian. And that is what this is. A securities position is a recognizable property right under the UCC. It's also recognized in the SIPA statute. Now, turning to why this is different from Carval, Carval involved a bilateral repo, a transfer of title on the assets between two parties, the repo parties and the broker-dealer. Here we have three parties. The counterparty of the swap was LBSF. The custodian of the collateral was LBI. The swap contract expressly said that LBI was not acting as the custodian for LBSF. It said the custodian provision is not applicable. So who is it acting as custodian for? That is the issue here, and I've done a ton of these. This is a classic tri-party collateral custody arrangement. They were much more precise after Lehman, for obvious reasons, and Dodd-Frank had to deal with this as well. Dodd-Frank said, we have got to get a hold on this because this stuff went all over the place and everybody lost their rights. So now everybody is more precise. My clients are calling all the time saying, how do we segregate collateral? How do we be specific? Now, yeah, they should have done it in the past. They didn't. We have the facts of the case that we have to deal with. But all the records, all the evidence says that LBI was acting for both parties. The control agreement that the trustee and SIPC focus on so much, if you do control agreements, I can own my bank account and give a lien to my secured party. All I have to do is the bank has to say, under this control agreement, I will follow you secured party's directions. It doesn't mean I don't own my bank account. That's exactly what happened here. And that is why this is different from Carvalho. Carvalho transferred title on the repo. Here, title never transferred. And the repo language in the swap agreement is identical to standard margin trading contracts. We quote them in our record. You have exceeded your time, but very interesting. You reserve two minutes for rebuttal. Thank you, Your Honor. We'll hear from the trustee. Good morning, Your Honors. May it please the Court. Sarah Cave, counsel to the appellee. James W. Giddens, the SIPC trustee for Lehman Brothers, Inc. I'm not sure that I can state our case much better than Your Honors have done this morning, but if you'll bear with me, it's clear that First Bank is back before this Court claiming the same collateral securities that it posted for the same swap agreement that this Court carefully looked at a year ago. And First Bank is claiming that it has an ownership interest. Really, this is a thinly veiled attempt, as Your Honor went to, to really recover money damages for a default by its counterparty, Lehman Brothers Special Financing. And as you alluded to, Your Honor, First Bank bargained for two remedies when it entered the swap contract. It had a breach claim against LBSF, and it had a guarantee claim against the parent company, Lehman Brothers Holdings, and it didn't file a claim for either. So it's our position, Your Honors, that . . . Could it have filed in the bankruptcy court? There's no reason why they could not have, and the record does indicate that they had conversations with individuals from LBSF and LBHI suggesting that they should go ahead and do that, and there's no reason in the record why they could not have filed that claim, Your Honor. So we asked the Court to affirm the district court, but if I could just respond quickly to several points that Mr. Honeywell just made. And to Your Honor's point, why this case isn't like Carvalho, we agree with Your Honor that, in fact, the case is very much like Carvalho, and, in fact, if anything, the claimant in Carvalho had possibly a stronger position because the claimant in Carvalho actually had entered into a contract with LBHI. As Your Honor pointed out, there is no contract, no agreement with LBHI here. And, in addition, the language of the credit support agreement here, the language in the swap contract, is that much stronger. It says free of any claim or right of any nature whatsoever. It's difficult to imagine why that language wouldn't cut off any interest at all. The second point I would make is to respond to Mr. Honeywell's point that LBHI was holding the collateral at all times. That is not the case. What the swap contract provided was that LBSF was, quote, deemed to hold the collateral at all times. And, finally, with respect to the long positions that Mr. Honeywell pointed to, if Your Honors actually look at the pieces of the stock record that are in the joint appendix, those long positions show that LBHI was long to the account for LBSF, the account that was called for LBSF, that LBHI and LBSF had entered into a contract to create for purposes of all the various counterparties that LBSF engaged in trading with. If Your Honors have no further questions, I'll yield the balance. You moved to expunge this, and that was what the district court granted? So we moved to expunge, Your Honor, in the bankruptcy court first, and the bankruptcy court granted that motion. We appealed that motion. We appealed, sorry, Mr. Honeywell appealed that to the district court, and the district court affirmed, and so we're asking that the court affirm that judgment. Thank you. Thank you. Then we'll hear from SEPA. Good morning, Your Honors. SEPA's being sued in this case, correct? Well, actually, the trustee is the individual who has to deal with the claim. SIPC protects customer claims, so it's not a direct claim against SIPC. My name is Kenneth Caputo. I represent the Securities Investor Protection Corporation. Good morning, and may it please the court. Should the court not preclude their claim based on collateral estoppel? We think it should affirm the decision below, because First Bank simply cannot meet the entrustment criteria that this court has consistently applied for more than 40 years to establish customer status under SIPA, and there are three basic reasons why they can't do it. One, it had no contract with LBI. It contracted with a separate company, LBSF, and the plain terms of that contract provide that LBSF was deemed to be holding the collateral at all times. First Bank admits this on page 26 of their opening brief, and if you look at their actual claim as filed with the trustee, First Bank states at paragraph 7 that First Bank was required to post collateral with LBSF, not with LBI. Second, the plain terms of the contract not only granted LBSF broad rights to use the collateral, to loan it, commingle it, or sell it, which they did, but it also said that LBSF could use the collateral, and I quote, free from any claim or right of any nature whatsoever of First Bank, including any right of redemption, unquote. Third, First Bank cannot demonstrate the indicia of a fiduciary relationship with LBI because it didn't even have a fiduciary relationship with its contractual counterparty, LBSF. The master agreement that counsel referred to makes this crystal clear, and it says in the master agreement that, and I quote, LBSF is not acting as a financial advisor or fiduciary of First Bank. So, as Judge Rakoff correctly held below, if there's no fiduciary relationship between First Bank and its contractual counterparty, there certainly can be no fiduciary relationship between First Bank and a third party. Now, suppose an ordinary investor comes along and goes to a broker, and a broker gets them to sign something which looks like each of these things. Does that necessarily mean that in that kind of relationship, there isn't, a court cannot say there is the kind of entrustment that Zipra was about? That is, the language that you quote me, quotas, is very, very powerful. I'm a little hesitant to go just on the language because I can conceive of situations where that language is being used by a broker to, in effect, take advantage of an ordinary customer and that we would read it in a different way. That doesn't mean we should read it that way when you're dealing with two grown-ups, but are you arguing that the language is necessarily determinative? The language is certainly determinative, Your Honor. This was a sophisticated financial participant, a bank, who came to LBI. So that when you have a sophisticated participant, this language is determinative. And even if you had an ordinary investor who went to Lehman Brothers and said to Lehman Brothers, you can do whatever you want with my money, you can sell it, you can loan it, and that's free from any right of any nature whatsoever for me to redeem my collateral, then, of course, yes, you would not be a customer. Furthermore, they went to do interest rate swaps. They had to go to a special-purpose Lehman vehicle to do that. They couldn't do that at the broker-dealer. They couldn't do that at the SIPC member. They were doing something that wasn't even a security as protected under the Securities Investor Protection Act. So here they are claiming that they are unique, first-impression case, the only one of its kind. One more point, and that is they make this argument that some sort of difference between the actual securities they're claiming and the securities positions under SIPA, that argument has no merit for three basic reasons. First, it's a distinction that's contradicted by their very claim. As Judge Rakoff correctly held, and the record clearly indicates, First Bank filed a claim seeking its securities, not securities positions, whatever that may be, and its claim form at JA 3308 when it says LBI owes me securities. Answer, yes. At JA 3314, in the narrative attachment to its customer claim, First Bank states that it's seeking the return of the pledged collateral, the securities. Second point, under SIPA, under the net equity definition referred to by counsel, one who is protected must first be a customer, and that is one with an account at the SIPC member. Here, the only account at the SIPC member was the account style First Bank of Puerto Rico pledge account for LBSF. And as Judge Rakoff correctly referenced in his decision, this wasn't just a finding of fact. This was a stipulation of fact found at JA 3053 paragraph 28. They stipulated to it. Final point, one with an account has its claim determined by a trustee who calculates the net equity, and that is the dollar amount that one is owed. That's how you get your pro rata share from the failed broker-dealer. And that calculation, which they reference, requires the trustee to perform what is essentially a legal fiction. The net equity definition found at 78LLL sub 11 in SIPA says that the dollar amount is the amount that would exist if the trustee had liquidated the customer's securities positions. But a trustee doesn't do that. In fact, under the payments to customers section in SIPA, that's found at 78FFF-2B2, it says, and I quote, with respect to claims relating to or net equities based upon securities, and of course that's what we're dealing with here, a trustee is obligated to satisfy the claim by returning to the customer the actual securities to the greatest extent practicable. So to sum up, under SIPA, one's protected for the actual securities at a broker. SIPA protects the custody function that a broker-dealer performs. Here, they were holding nothing. Those rights were cut off. A claim in bankruptcy is a right to a payment. There is no right to payment when the right has been cut off, as this court has already concluded. Thank you, Your Honor. Thank you. Thank you. Mr. Honeywell, you've reserved two minutes for rebuttal. Thank you, Your Honor. Just a few final points. The trustee and SIPA go to great pains to emphasize language. Let's talk about language. The security agreement of the swap contract itself said that the custodian provision was not applicable. In other words, LBI was not acting as a custodian for LBSF. The books and records that evidence the long positions throughout the life of the case were coded as a customer account, and they were coded as a safekeeping account. The LBSF itself signed a subordination agreement in 1995 saying that it was not a customer. That is in the record. It's undisputed. So who was the customer indicated in the customer account in LBI's collateral account that was held here? Maybe it meant that there were no such customers involved in sophisticated interest rate swaps, which post securities is collateral. The lack of a designation of a customer doesn't create the existence of one under SIPA. It just perhaps implies that there was no customer relationship whatsoever. This Court's— What were, in your arrangement with LBSF, where is the word customer up here? It is nowhere. Ah, there's no word customer in the LBSF, Your Honor. No, the— Ah, okay. The definition of customer is in the SIPA statute itself. I understand where it is, but I asked you—you were talking about agreements, so I was asking perhaps there was—customer was mentioned in your agreement with Lehman. Happy to talk about agreement. The SIPA customer definition requires that there be a securities account. A security account is not defined in the SIPA statute. Okay. The only place it is defined is in UCC Article 8, and it expressly says in that provision, 8501, and the official commentary, that an agreement for UCC purposes and for the meaning of a security account does not have to be written. It can be implied from the course of— An oral agreement? You're telling me there's an oral agreement between Lehman Brothers Securities Holding and— I am not. Because I didn't see that in your brief either. I am not saying I'm— You're saying by the nature of the agreement it was— By the nature of their relationship over 11 years, it can be implied under the UCC by a course of dealing and industry practice. Okay, great. Thank you. Thank you. Thank you all. We'll reserve decision.